## WARD & GOW *v.* KRINSKY ET AL.

ERROR TO THE SUPREME COURT, APPELLATE DIVISION, THIRD JUDICIAL DEPARTMENT, OF THE STATE OF NEW YORK.

No. 343. Argued December 14, 1921.—Decided June 5, 1922.

1. The rights of employers under the Fourteenth Amendment are not violated by an extension of the New York Compensation Act (see *New York Central R. R. Co.* v. *White,* 243 U. S. 188) to all employments in which four or more workmen or operatives (farm laborers and domestic servants excepted) are regularly employed, construed by the state court as including, also, all other employees of the same employer and employed in the same business with such workmen and operatives, though at places remote from their work. Pp. 510, 513, 516.

2. So *held* of an employer in the business of disposing of advertising space on the cars and station platforms of subway and elevated railway lines in a city, and of selling newspapers, etc., at booths located on the platforms; with numerous employees, including executives, clerks, inspectors, chauffeurs and porters; and many salesmen working in the booths separately and apart from other employees; and where the injury in question was inflicted upon such a salesman by a subway train while he was engaged in emptying from the platform upon the tracks a pail of water, used in connection with his work in his booth. P. 507.

193 App. Div. 557; 231 N. Y. 525, affirmed.

ERROR to a judgment of the Supreme Court of New York, Appellate Division, entered upon remittitur from the Court of Appeals, and affirming an award of compensation made by the New York Compensation Commission in favor of the defendant in error Krinsky.

*Mr. Herman S. Hertwig* for plaintiff in error.

A classification of occupations as hazardous must bear reasonable relation to the facts.

. Down to the present time, it has been expressly recognized, by both courts and legislatures, that hazard must in fact exist in an occupation to afford a basis for the exercise of the police power through compensation legis-. lation. By hazard is meant inherent dangers, greater than those existing in the innumerable occupations commonly regarded as non-hazardous. *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Arizona Employers' Liability Cases,* 250 U. S. 400.

The compensation plan was put into operation in New York first over certain conspicuously hazardous occupations like mining, railway operations, etc., described in forty-two groups. After the validity of the law was upheld in *New York Central R. R. Co.* v. *White,* 243 U. S. 188, in regard to such obviously hazardous employments, it was next extended by Laws 1916, c. 622, to embrace every employee whose employer was prosecuting one of the hazardous operations as his principal business, whether the occupation of the employee himself was hazardous or non-hazardous. This extension was founded apparently on the theory that where the principal business is hazardous, the legislature may reasonably assume that all employees are in some manner affected by the hazard of the principal operation. The validity of it under the Constitution, so far as we can discover, has not been considered, either in the state courts or in this court. It may well be seriously questioned.

The New York Legislature took as a point of departure in its next enlargement of the scope of the law a provision of the Ohio Workmen's Compensation Law characterizing as inherently hazardous the work of manual laborers in groups of five or more. Gen. Code Ohio, §§ 1465–60, upheld in *State* v. *Creamer,* 85 Oh. St. 349; and again in *Jeffrey* v. *Blagg,* 90 Oh. St. 376, affirmed, 235. U. S. 571. The basis for the holding seems to have been that the mere association of manual workers in group labor neces-

sarily renders their work hazardous by reason of the concurrence in such group labor of so many imperfect human factors. *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152, 159.

With such coöperative labor groups thus established as reasonable objects of imputed hazard, the New York Legislature proceeded to use such groups—not, like the Ohio Legislature, simply as objects themselves of compensation, but as the nucleus for a comprehensive group, drawing into the compulsory compensation plan all employees of an employer who happens to employ four or more workmen or operatives. The result was second Group 45.

This extension of the law is revolutionary. If valid, it subjects to the compulsory compensation law practically every employer of any consequence in the State, because there are few employers with a dozen or more employees in their service who do not have at least four among them engaged in some manual labor. They must either maintain compensation insurance for all, at heavy annual premiums, or else make deposits of securities with the State to guarantee payment of compensation benefits.

In twenty years of operation by the plaintiff in error, there have been but four accidents among employees, and all these have been among the manual laborers who are covered by insurance. In these twenty years, there has never before been an accident among the other employees constituting the vast majority of the plaintiff in error's force.

The occupation of the claimant himself and of the vast majority of his co-employees was conspicuously free from hazard. His injury was the consequence, not of any hazard inherent in his employment, but of gross personal negligence and incredible folly that would have brought injury to any person in any occupation whatever.

In private employments, made subject to compulsory compensation laws, the quality that has been declared by

legislatures and courts alike to clothe such employments with public interest, and thus to justify intervention by the legislature, has been that of inherent hazards of the employments, exposing employees, without regard to fault on either side, to death or to physical injuries more or less disabling, with consequent impoverishment, partial or total, of the workman or those dependent upon him. *Arizona Employers' Liability Cases,* 250 U. S. 400, 428. Without the presence of such hazard in an employment, these features of public concern are lacking, and this means, as was demonstrated in *Munn* v. *Illinois,* 94 U. S. 113, that the necessary foundation for police regulation is lacking.

*Mr. E. Clarence Aiken,* with whom *Mr. Charles D. Newton,* Attorney General of the State of New York, was on the brief, for the State Industrial Commission, defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

The New York Workmen's Compensation Law of 1913–1914 [Laws 1913, c. 816; Laws 1914, cc. 41 and 316] sustained as constitutional against attacks based on the due process and equal protection clauses of the Fourteenth Amendment in *New York Central R. R. Co.* v. *White,* 243 U. S. 188, after several amendments was further amended by c. 634 of the Laws of 1918, which added to the list of hazardous employments in § 2 a new sub-division or group, as group 45—the second to be so designated—reading as follows: " Group 45. All other employments not hereinbefore enumerated carried on by any person, firm or corporation in which there are engaged or employed four or more workmen or operatives regularly, in the same business or in or about the same establishment, either upon the premises or at the plant or away from the plant of the employer, under any contract of hire,

express or implied, oral or written, except farm laborers and domestic servants."

The present writ of error raises the question whether the Compensation Law, as thus extended, if construed and applied so as to impose upon plaintiff in error a liability for compensation in the case of defendant in error Himan Krinsky, is in contravention of either of the cited constitutional provisions.

The singularity of the facts makes a somewhat particular statement necessary to a clear understanding of the argument. Plaintiff in error, Artemas Ward, under the name of Ward & Gow, leases from the Interborough Rapid Transit Company advertising and vending privileges upon various subway and elevated railway lines in the City of New York, and carries on the business of disposing of advertising space in the cars and on station platforms, and selling periodicals and various articles of merchandise in booths located upon the platforms. In the latter department, which alone requires mention, there are 307 employees, including executives, office workers, news stand inspectors who travel singly over the different elevated and subway lines to inspect displays and see that the sales booths are properly kept, chauffeurs who drive trucks transporting merchandise from headquarters downtown in Manhattan to the different subway and elevated stations, 18 porters for loading and unloading the trucks at headquarters, and various others, among them 125 news stand salesmen, each of whom is stationed at a booth in a subway or elevated railway station, and whose work is separate from that of other employees. Each of them goes directly to his stand in the morning and thence to his home in the evening, and his duties consist of keeping a display of papers, magazines, candies, and other small articles in proper order, selling them across the counter, keeping an account of sales and turning in the collections. The only other employees with whom a salesman comes in contact

are the inspector, and the chauffeur who brings supplies from the truck, either down to the subway or up to the elevated platform, and passes them across the counter to the salesman.

Krinsky was one of these salesmen, stationed in a booth at a subway station in the Bronx. The booth was a steel structure 12 feet long, 8 feet wide or high, 2½ feet deep, located against a wall 10 feet from the edge of the platform. In order to keep the booth and its contents free from dust, and his hands in a proper condition of cleanliness, water was kept for convenience in the booth, in a pail furnished by the employer, to be emptied by Krinsky when necessary, and replenished with water obtained from a washroom two flights of stairs above the train level. He was in the habit of emptying the water in the morning upon the tracks of the subway and replenishing the supply before starting business. One morning in February, 1919, while thus emptying the water as usual, Krinsky was struck upon the side of the head by an approaching train, his skull was fractured and he sustained disabling personal injuries which the Industrial Commission found were accidental and arose out of and in the course of the employment.

An award of compensation made by the commission was affirmed by the Appellate Division of the Supreme Court (193 App. Div. 557), and its judgment was affirmed without opinion by the Court of Appeals. The record was remitted to the Appellate Division, which made the order and judgment of the Court of Appeals its own, and to it as custodian of the record the present writ of error was directed.

It was not disputed in the state courts, nor is it questioned here, that in the merchandising department of plaintiff in error there were more than four "workmen or operatives" within the meaning of second group 45 of § 2 of the Compensation Law. Evidently the porters were

such, and clearly were " engaged in the same business " with the salesmen, for they loaded the trucks which carried the merchandise from the central depot to the booths. The Appellate Division held that the salesmen, although not " workmen or operatives ", nevertheless were within the protection of the statute. Reference was made to the definition of " employee " in subdivision 4 of § 3, amended by Laws 1916, c. 622, and Laws 1917, c. 705, so as to include anyone in the service of an employer whose principal business is that of conducting a hazardous employment, construed in previous decisions as bringing within the protection of the statute all employees accidentally injured in the performance of duties incidental to the prosecution, of a business defined as hazardous, even though such duties were not a part of the characteristic process or operation forming the basis of the group (*Matter of Dose* v. *Moehle Lithographic Co.,* 221 N. Y. 401, 405; *Spang* v. *Broadway Brewing & Malting Co.,* 182 App. Div. 443; *Joyce* v. *Eastman Kodak Co.,* id., 354); and it was held that since this rule applied to all the other groups defined in § 2, it must be applied in respect to second group 45. That the view of the Court of Appeals was substantially the same, appears not only from its affirming the judgment of the Appellate Division without questioning its reasoning, but from the opinion delivered by the Court of Appeals itself in a case decided at the same time with this, *Europe* v. *Addison Amusements, Inc.,* 231 N. Y. 105. Europe was conductor of a famous band of musicians who, after a military service with the American Forces in France, went upon a concert tour throughout the United States, under employment by Addison Amusements, Inc. With the band of sixty-five pieces there were four or more workmen or operatives employed to accompany it, arrange platforms, chairs and scenery, handle baggage, etc. Europe himself, although an employee was not among those described as " work-

men or operatives," nor engaged in hazardous work, ordinarily so-called. During an intermission in the program of a concert he was stabbed and killed by a drummer of the band. The Court of Appeals, sustaining the Industrial Commission and the Appellate Division, held that he was within the protection of second group 45.

In the exercise of our appellate jurisdiction we are bound by the construction of the state law adopted by its court of last resort; hence for present purposes it must be taken as settled that the legislature intended the compensation law as amended to apply to an employee in Krinsky's situation, precisely as if it were so declared in the words of the statute. Our function is confined to determining whether, as so construed and as applied to the concrete facts of the case, the statute contravenes the limitations imposed by the Fourteenth Amendment upon state action.

Under the due process of law clause, plaintiff in error contends that the validity of compulsory workmen's compensation acts depends upon the inherently hazardous character of the occupations covered; that a legislative declaration that a certain employment is hazardous is not conclusive; and that to impose upon the employer, as is said to be done in this instance, a liability to make compensation to any employee out of hundreds whose occupations are non-hazardous, because four or more workmen or operatives may happen to be regularly employed in the same business, or in or about the same establishment, although not brought into contact with the injured employee, and where, to use the words of counsel, " his injury was the consequence not of any hazard inherent in his employment, but of gross personal negligence, or incredible folly that would have brought injury to any person in any occupation whatever," is so altogether unreasonable as to be wanting in due process. The argument rests upon the curious misconception that the legislature

regarded the workmen or operatives as the sole source of danger to those engaged in the same business with them; and upon the assumption, equally untenable, that the occupation of a salesman at a subway station, protected ordinarily by the comparative security of a steel booth but called upon at times, in the line of duty, to go into the moving throngs of passengers and into close proximity to the rails upon which locomotives and trains are moving, is free from inherent hazard to the salesman.

That Krinsky's injuries arose out of and in the course of his employment was found by the commission, whose findings and decision were affirmed by both courts, and must be conclusive upon us unless ascertained to be without support in the evidence, including any reasonable inference that may be drawn from it.

As has been seen, he was charged with the sale of a stock of merchandise belonging to the employer, and for this purpose was stationed in a booth placed upon the platform of a subway station, about ten feet from the tracks. There was evidence showing that he had sole responsibility for the care and display of this merchandise, which, of course, he was to sell to the passing throngs of train passengers, and was required to keep the booth, the stock, and his own person in a cleanly condition. The employer supplied a container for water to be used for the latter purpose, and naturally this was kept in the booth, emptied and replenished by Krinsky as occasion required. He was not instructed how this should be done, and the state commission and courts reasonably might infer that he was at liberty to do it in the most convenient and expeditious mode. To say, as is suggested, that he was constrained to close and lock the booth, leave it and go up two flights, either by elevator or staircase, in order to empty the water, with consequent interruption of business in the meantime (thirty minutes, according to the evidence), when the same object could be accomplish d

in a few moments and without closing the booth by stepping ten feet across the platform to the edge of the track and there emptying the water, relying upon a volunteer assistant to bring a fresh supply, would be to place a strained and unreasonable construction upon the scope of implied duties. True, he might have avoided the particular hazard that overtook him, had he chosen the tedious journey two flights up and down again, instead of the half-dozen steps across the platform to the edge of the track. Whether, in the hurry and bustle of a subway crowd, the nature of Krinsky's duties required or permitted him to follow the slower course, or even that it involved less probability of personal injury than the one habitually adopted, are questions upon which the commission and the state courts are peculiarly fitted to draw correct inferences. Certainly, we are not warranted in holding that the findings are without support in the evidence.

A sufficient vindication of compulsory Workmen's Compensation and Employers' Liability Acts, as it has seemed to this court, is found in the public interest of the State in the lives and personal security of those who are under the protection of its laws; from which it follows that, when men are employed in hazardous occupations for gain, it is within the power of the State to charge the pecuniary losses arising from disabling or fatal personal injury, to some extent at least, against the industry after the manner of casualty insurance, instead of allowing them to rest where they may happen to fall—upon the particular injured employees or their dependents; and to this end to require that the employer—he who organizes and directs the enterprise, hires the workmen, fixes the wages, sets a price upon the product, receives the gross proceeds, pays the costs and the losses and takes for his reward the net profits, if any—shall make or secure to be made such compensation as reasonably may be prescribed, to be paid in

the event of the injury or death of one of those employed, instead of permitting the entire risk to be assumed by the individuals immediately affected. In general, as in the New York law, provisions for compulsory compensation are made to apply only to those employed in hazardous occupations, where it may be contemplated by both parties in advance that sooner or later some of those employed probably will sustain accidental injury in the course of the employment, but where nobody can know in advance which particular employees or how many will be the victims, or how serious will be the injuries. *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 202, *et seq.; Mountain Timber Co.* v. *Washington*, 243 U. S. 219, 239, 243–244; *Arizona Employers' Liability Cases*, 250 U. S 400, 420, 422–426.

That there was inherent hazard in Krinsky's occupation is conclusively shown by the fact that in the course of it he received a serious and disabling personal injury arising out of it. That the event might have been foreseen is demonstrated by the way in which it occurred, not to speak of the fact that the legislature actually foresaw it and made provision for it, long before it occurred. Hence there was no undue deprivation of the liberty or property of plaintiff in error, or his right to acquire property in lawful business, in the act of the legislature which required him to take warning and make provision against the event which afterwards in fact occurred.

It will be seen that while, by the terms of the statute, the employment of "four or more workmen or operatives regularly, in the same business or in or about the same establishment," etc., apparently is indicated as the basis of the new group—one rather frequently adopted in laws of this character, *Jeffrey Manufacturing Co.* v. *Blagg*, 235 U. S. 571, 574, etc.; *Middleton* v. *Texas Power & Light Co.*, 249 U. S. 152, 159;—in effect, by the construction adopted by the state court and binding upon us, the em-

9545°—23——33

ployees brought within the compensation features of the
act include not only the " four or more workmen or oper-
atives ", or others injured through contact with them, but
any and all other employees in the same business who
may suffer accidental and disabling injury arising out of
and in the course of their employment, although due to
incidental hazards not typical of the group.

The contention that by this construction second group
45 has been extended beyond the limit allowable con-
sistently with due process of law and " has been applied
in this case to an employment with no inherent hazard
whatever," rests upon an assumption of fact disproved by
Krinsky's experience. Were it not so, the argument is
self-destructive. The statute requires the employer to
make or secure compensation for the disability or death of
an employee only where it results from accidental per-
sonal injury arising out of and in the course of the em-
ployment. Where the employment is entirely free from
inherent hazard to the employee, the statute imposes no
responsibility upon the employer, hence cannot substan-
tially interfere with his liberty or property, with or with-
out " due process of law." *Arizona Employers' Liability
Cases,* 250 U. S. 400, 429.

Reducing the argument by omitting the extravagant
statement that so plainly leads to absurdity, it may be
outlined thus: that Krinsky's occupation was no more
hazardous than that of millions of residents of the metro-
politan district who daily make use of the subways and
elevated railways in going to and from their work;
that there had been no such accident among plaintiff
in error's employees in 20 years of operation; and that
it is unreasonably and unnecessarily burdensome to re-
quire the employer to either maintain compensation insur-
ance at heavy annual premiums, or deposit securities with
the State to guarantee payment of compensation benefits,
where the probability of injury is so slight. The answer is

easy: To the self-insurer no liability accrues except as disabling injuries actually occur; the giving of security, a reasonable regulation in aid of the general scheme (*New York Central R. R. Co. v. White,* 243 U. S. 188, 208–209), does not increase the obligation. To the employer who insures, presumably the premiums will not exceed a reasonable estimate of the risk; to him who insures in the state fund, there is an assurance of equivalency in the public administration of the fund under § 90, *et seq.*, of the law, especially the duty imposed upon the state board by § 95 to keep separate accounts as to each group so as to determine equitable rates, to rearrange the groups by withdrawing any employment embraced in one group and transferring it wholly or in part to another, to set up new groups at discretion, to determine the hazards of the different classes composing each group and to fix the premiums therefor, based upon the total pay-roll and number of employees in each class of employment, at the lowest possible rate consistent with the maintenance of a solvent insurance fund and the creation of a reasonable surplus and reserve. A similar system was sustained in *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 241–243.

The fallacy of the argument for holding it arbitrary and unreasonable to impose upon the employer the burden of making compensation in employments where injury is improbable and difficult to be foreseen, should be fairly apparent when it is pointed out that, in the absence of the statute, not a part but the entire loss consequent upon a disabling or fatal injury arising out of and in the course of the employment would have to be assumed and borne by the disabled employee or his dependents, just as under the statute they still must bear all beyond the scheduled compensation. Yet they have no better opportunity to foresee the casualty than the employer, and (in the judgment of the legislature) less opportunity to make pro-

vision against it. The common-law rule, requiring the employee to assume the risk, and to take account of it in advance when fixing the wages, recognized dimly that the cost of industrial accidents ought to be borne by the industry, but failed to effectuate such a purpose, partly for the very reason that the hazard could not be estimated by the individual in advance, nor the loss provided against without coöperation.

The extension of the Compensation Law by addition of second group 45, following the recent modification of the definition of " employee," far from demonstrating in its application to Krinsky's case unreasonable, arbitrary action by the State through its legislative department, shows, rather, intelligent foresight, an anticipation, based upon practical experience in the operation of the law as it stood before, that, however little foreseen by persons immediately concerned, accidental disabling injuries inevitably would occur in occupations not previously classed as hazardous, and a reasonable determination to include them in a scheme already found to be free from constitutional objection in its general application.

We have sufficiently indicated grounds for holding that the statute as thus extended is not repugnant to the guaranty of " due process of law " in the Fourteenth Amendment.

That it does not deny to plaintiff in error " the equal protection of the laws," is equally clear. The argument that it does proceeds upon the untenable theory that if hazard be imputed to the employment of " four or more workmen or operatives regularly, in the same business or in or about the same establishment," its effect in the scheme of compensation must be confined to the hazards attributable to group labor. In *Jeffrey Manufacturing Co.* v. *Blagg,* 235 U. S. 571, 575; and *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152, 159, a somewhat similar classification was sustained, but not upon any limited

ground.   In the framing of so far-reaching a scheme of legislation, dealing with occupations so diverse, necessarily a wide range must be accorded to legislative discretion about defining the groups to which it shall apply.   Lines must be drawn, and it is not to be assumed that they have been drawn without good reason.   The difference between the larger and the smaller establishments may be recognized as a basis of classification in legislation affecting the defenses of contributory negligence and assumption of risk, as was held in *Jeffrey Manufacturing Co.* v. *Blagg, supra.*   So, the minimum number in a single employ may be regarded, we think, in arranging a system designed to distribute the burden of industrial accident losses with a view to the ability of the industry to bear it.   Nor need a law framed on the lines of that under consideration confine the compensation narrowly to typical cases, where it is confined, as here, to cases actually arising in the course of gainful employment, and due to inherent hazards of the occupation.   Second group 45 applies impartially to all employers who come within the descriptive terms; the employment of " four or more workmen or operatives regularly " is treated as the nucleus of a business probably involving personal hazard to some of those employed; and the same rule of construction is applied to this as to other groups.

But, it is insisted, neither *stare decisis* nor *ita lex scripta est* furnishes an adequate reply to a constitutional objection.   This court sustained the New York Workmen's Compensation Law, and the kindred statutes of Washington and Arizona, fundamentally upon the ground of the hazardous nature of the occupations covered.   If that ground is defensible at all—so runs the argument—the system must be confined to occupations actually hazardous in their nature; a legislative definition is not sufficient, nor is the occurrence of a single accident, much less one so singular and so little related to his general duty as that

which befell Krinsky, adequate proof of occupational hazard. It might occur to anybody, any day, on his way downtown to business, were he not especially careful. This is too fantastic a definition of "inherent risk" to form a basis of a law which must conform to standards of reasonableness. And again, how can the classification resorted to in second group 45 be sustained as reasonable, within the requirements either of the "due process of law" or the "equal protection of the laws" provisions of the Fourteenth Amendment? The occupation of a salesman stationed alone far uptown in the Bronx does not become hazardous simply because four or more porters are regularly employed at headquarters downtown in Manhattan. How can we accept the reason suggested by the Court of Appeals in the *Europe Case, supra,* (somewhat at random, it should be said, and when the court, by its own confession, was not required to test its adequacy), "that a business not ordinarily hazardous becomes such at times when manual work is done or machinery operated in connection with its main purpose"? This would be an assumption contrary to common experience—especially as applied to manual work downtown in Manhattan and the occupation of a single salesman—it might as well have been 500 clerks—uptown in the Bronx. What reason is there for imposing compulsory liability upon the employer of salesmen or clerks in the Bronx simply because he finds it convenient to employ at the same time, but in separate duties, four workmen or operatives in Manhattan? He might dismiss the workmen—his neighbor and business competitor might dispense with such workmen—and thus gain immunity from the statute. Classification is permissible in legislation only when based on reasonable grounds. This peculiar grouping is classification gone wild. It cannot be sustained by the simple and obvious tests applied in *Jeffrey Manufacturing Co.* v. *Blagg, supra,* and kindred cases.

This, we believe, is a fair summary of the reasoning expressed or suggested in the brief and in the oral argument of plaintiff in error. We have not minimized its force, and concede that, if it is to be taken seriously, it seems to subject second group 45, and the Compensation Law as extended by this and other recent amendments, to a test that ought to be responded to satisfactorily if the validity of the statute is to be made clear.

Many of the propositions may be admitted—for the purpose of the argument only—as correct according to *a priori* standards, and unanswerable without resort to the tests of experience. We shall endeavor, with some care, to answer from the latter standpoint, not contenting ourselves with some rather too obvious replies already suggested.

The New York Workmen's Compensation Law by its terms is based upon the existence of actual, not hypothetical, inherent hazards confronting employees in gainful occupations; was sustained as valid by this court upon that ground in *New York Central R. R. Co.* v. *White, supra;* has been administered by the State constantly on that basis; and second group 45 shows no clear evidence of a purpose to depart from it. We leave wholly aside, as not here involved, the question whether the new group could be sustained on any other basis. Any question about the validity of an act purporting to impose compulsory liability upon employers for losses due to occupational hazards where there really are no occupational hazards, may safely be left until such a case is presented.

Next, we agree that, in a test of constitutionality under the Fourteenth Amendment, the question whether there is inherent hazard in an occupation or a group of occupations is not to be settled conclusively by a legislative declaration or by an empty form of words. We add, it is not to be settled, hardly is affected, by an arbitrary *a priori* statement, unaided by the light of experience in

which the legislature acted, that there is *absolutely no* inherent hazard in an occupation, especially where it appears that even one employee has been seriously injured while acting in the line of his duties in a manner that easily might have been anticipated by the employer, or the inspector who supervised his work, to say nothing of the employee himself, had either of these exercised the ordinary care of the reasonably prudent man to whom the common law so frequently resorts for a standard. The legislature, in the New York system, is justified in extending the benefits of the Compensation Law as far as it reasonably may determine occupational hazard to extend —to the " vanishing point " as it were—and any lines of group definition it may adopt, if easily understood and applied, cannot reasonably be called " an empty form of words " merely because they do not carry on their face the reasons for adopting them.

Again, we agree that (if it were necessary, as we hold it is not, that group lines should explain themselves), the suggestion quoted from the opinion of the Court of Appeals in the *Europe Case* hardly offers a satisfactory explanation of the new group, reasonably definite and substantial in its basis, within the tests of the Fourteenth Amendment. But this court, while bound by the *construction* of the statute adopted by the state court of last resort—that being a question of state law—is not concluded by its *reasoning* but must exercise an independent judgment, when called upon to determine the federal question whether the act as construed and applied, is repugnant to the restrictions of the Amendment. Any suggestion from the state court *in aid* of the act fairly may be accepted; but a suggestion having an adverse effect, while entitled to respectful consideration, is not to be taken as weakening the action taken by the State through its legislative branch, or as furnishing an *exclusive* statement of the grounds upon which the legislature acted. It

is proper to say that in the *Europe Case* no question of the constitutionality of the new group 45 appears to have been presented, and the court alluded to the phraseology merely to dispose of the question of construction.

In examining the Compensation Law and its many amendments, including the one in question, and the workings of the law as indicated by the decisions cited and others, we have been impressed again and again, to the point of complete conviction, that this act or any of its amendments is not the work of novices or bunglers. *A priori* reasoning has not been resorted to; there is no reliance upon generalizations or " common knowledge "; no " simply because "; nothing taken for granted. No case that we recall illustrates more aptly or forcibly the wisdom of the familiar rule, expressed by this court in a recent case in these terms: " There is a strong presumption that a legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems. made manifest by experience, and that its discriminations are based upon adequate grounds." *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152, 157. The law was passed in 1913 and reënacted in 1914 after the taking effect of a constitutional amendment adopted under circumstances mentioned in the *White Case,* 243 U. S. 188, 195; the decision of this court was announced in March, 1917; meanwhile, administration commenced July 1, 1914, and was continued for four years prior to the enactment of second group 45; a multitude of compensation rulings, opinions of the Attorney General, and court decisions, sufficiently reported to the public, together with the administration of the state insurance fund, and a study and adoption of the plan of classifications used by private casualty insurance companies for underwriting business, may give but an inadequate impression of the informed, expert opinion upon which the legislature might, and we fairly may presume did, draw for aid in framing the new group.

·· .What was it they were aiming at, and how did they seek to accomplish it? We need not be sure of hitting upon a correct, much less a complete, explanation. Upon the general presumption referred to the questioned group must stand, unless it were demonstrated to a moral certainty, beyond a reasonable doubt, that the grouping could not possibly be explained on reasonable grounds. ·

Let us assume that after four years' practical experience in the operation of the Compensation Law, aided by the intensive studies of the Commission, the legislature was satisfied with the law as well suited to the needs of the people, except that it did not go far enough and left uncovered much ·unclassified ground where undefined and virtually undefinable industrial hazards remained. It was desired to leave out, as before, farm laborers and domestic servants; a classification sustained upon simple grounds, doubtless far from expressing in full the reasons that had actuated the legislature, in *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 208.

Aside from this, let us suppose it was desired to extend the benefits of the law as far as practicable from the administrative standpoint; abandon the attempt to go further in grouping occupations as hazardous because of the names by which they are described, include all remaining businesses, above a fixed minimum, in a single group, treat them all as more or less hazardous, and leave questions as to the particular degree of hazard, and the proper grouping of businesses as between themselves, to be worked out by the Commission in the light of experience, according to the methods of private casualty insurance companies, as already was done with the existing groups.

Was actual inherent hazard ignored? Not at all; rather it was treated as virtually universal, but incapable of being precisely defined or classified by fixed statutory rules in advance, and more easily treated in the light of experience; the new group was to be a part of a law which oper-

ates, as nearly as experience may guide, not *in vacuo*, but only where there is actual inherent hazard and to the extent that it extends.

But why begin with " four workmen or operatives regularly employed? " Possible answer: It was necessary to begin somewhere; the legislature must decide where; it is reasonable to believe there is some actual inherent hazard, where even as few as four workmen or operatives are employed steadily, though it be no more than may arise from the danger of their injuring each other; besides, an employer who has as many as four workmen or operatives regularly employed, reasonably may be counted on to have a payroll account that may be made the basis upon which to compute the premiums for state insurance; below four, the business perhaps hardly would pay the cost of administration, hardly give opportunity to distribute the loss, according to the general principle of insurance which runs throughout the Compensation Law.

But why extend the responsibility of the employer to others in the same employ whose occupations are separate and non-hazardous? Possible answer: It is the employer himself who commingles in a single business or establishment those doing the more hazardous with those doing the less hazardous work, if it is done. If it be practicable to carry them on separate payrolls, presumably the Commission has the discretion to adjust it in fixing the amount of securities to be deposited under § 50, or the premium rate under § 95. Further possible answer: The difficulty is inherent in the subject; in years of practical experience, it had been found that in the extremely varied and complex organization of industry, disabling or fatal injuries occur when least expected, and in ways not characteristic of any particular industry described. The legislature hardly could be called upon to predict, any more than the employer, who was to be injured; and to confine the cost of casualty insurance strictly to those who were

sure to be " casualties ", might baffle the efforts even of the experienced legislators who framed second group 45. Accidents cannot be relied upon to follow the symmetrical lines of group description; this is a difficulty that showed itself under the groups as they stood before, and led to the 1916 amendment of the definition of " employee ". Even clerks and salesmen cannot, in this busy day, be confidently treated as immune from industrial hazards; if a general rule must be declared, it would be safer to say, on the basis of experience, that no occupation is free from industrial hazard, than to say that any specified occupation is free. Even the probable oversights or want of vision of the employer are an appreciable source of danger to clerks, as witness *Joyce* v. *Eastman Kodak Co.,* 182 App. Div. 354, where a clerk employed by a maker of photographic cameras and supplies (classed as hazardous in group 23) but engaged in clerical duties having no direct connection with the manufacture, was injured because of a defect of the chair in which she was sitting at work. A like suggestion arises in the case before us, where the employer insured the chauffeurs who drove the trucks with merchandise to the various stations, but failed to insure the salesmen, overlooking the fact that they also occasionally were subjected to peril in the line of duty. It may be objected that these cases are not typical; but the legislature may have realized, as an element of the problem with which they were dealing, what indeed is proverbial, that accidents do not conform to types; that they are one thing that happen " simply because "—they *are* accidents. The particular cases are not imaginary; they actually occurred, and were brought to the test of the Compensation Law. The legislature may have had the best of reasons for believing that others as strange were happening rather frequently in the great, busy, bustling population of the Empire State; that while an individual clerk's or salesman's life and limb perhaps were less in danger than an indi-

vidual machinist's, yet they were in appreciable danger; there were more clerks and salesmen than machinists; many times, naturally, they would be employed in the same business with machinists, or other "workmen or operatives"; any seeming incongruity or unfairness in grouping them together under the Compensation Law may be taken care of through the operation of the law itself, according to the tests of experience; second group 45 will cost nothing, in the large sense, beyond expenses of administration, if it should happen to reach where industrial hazard is non-existent; it will not be more burdensome than the industrial losses prove to be, where such hazards do exist.

And so we venture to suggest again, what has been hinted before, that *the common employer* may have been the mysterious link between the workmen in downtown Manhattan and the 125 scattered salesmen so far removed from the dangers of group labor. The legislature *may have* found it impracticable to charge industrial losses against the industry without seeking out him to whom it falls to pay other expenses; hence took the industries as they found them actually organized, holding each employer responsible as to all in his employ " in the same business or in or about the same establishment ", etc., leaving the Industrial Commission to determine in particular cases whether the hazards are great or small, whether the employer should be required to deposit securities in advance, in what amount, what the premium rate ought to be, and all doubtful matters, according to experience; confident that an employer competent to conduct a business requiring " four or more workmen or operatives regularly " may be relied upon to make a profit above his payroll, insurance premiums, and other like expenses.

The State of New York, by constitutional amendment, has made this system due process of law for that State.

We are unable to say that in extending it by the addition of second group 45 the State has in the least degree exceeded the limitations imposed by the Fourteenth Amendment.

*Judgment affirmed.*

MR. JUSTICE McREYNOLDS, with whom concurred MR. JUSTICE McKENNA, dissenting.

The New York Workmen's Compensation Law provides:

" § 2. Application. Compensation provided for in this chapter shall be payable for injuries sustained or death incurred by employees engaged in the following hazardous employments: . . .

" Group 45. All other employments not hereinbefore enumerated carried on by any person, firm or corporation in which there are engaged or employed four or more workmen or operatives regularly, in the same business or in or about the same establishment, either upon the premises or at the plant or away from the plant of the employer, under any contract of hire, express or implied, oral or written, except farm laborers and domestic servants."

By subdivision 4, § 3, " employee " is defined as—

"A person engaged in one of the occupations enumerated in section two or who is in the service of an employer whose principal business is that of carrying on or conducting a hazardous employment upon the premises or at the plant, or in the course of his employment away from the plant of his employer; and shall not include farm laborers or domestic servants."

In *Europe* v. *Addison Amusements, Inc.,* 231 N. Y. 105, the Court of Appeals construed these provisions and some quotations from the opinion will show their far-reaching effect.

"The legislature, in § 2, has classified certain employments as hazardous, and has given the right of compensation to employees engaged in such hazardous employments.

"By the amendment of subdivision 4, § 3 (Laws of 1916, c. 622, § 2), an employee, to be entitled to compensation, is no longer required to be himself engaged at the time of accident in hazardous work. It is sufficient that he is an employee in such hazardous business. *Matter of Dose* v. *Moehle Lithographic Co.*, 221 N. Y. 401.

"Group 45 as above quoted, was added by the Laws of 1918, c. 634, § 2. The legislature classified as hazardous employments all those occupations in which there were regularly engaged four or more workmen or operatives. It covered employments not specified in the other subdivisions. No doubt it was considered a risk to be in an employment where four or more manual laborers or operatives were engaged. It is not necessary for us finally to define or limit the words ' workmen ' or ' operatives ' as used in this subdivision. Generally speaking, a workman is a man employed in manual labor, whether skilled or unskilled, an artificer, mechanic or artisan, and an operative is a factory hand, one who operates machinery. Webster's New International Dictionary. There is a marked distinction between a workman and an employee. Although in a general sense all workmen and operatives are employees, yet all employees are not workmen or operatives, within the meaning of this law. The words ' workmen ' and ' operatives ' are used in their narrower meaning. *Bowne* v. *S. W. Bowne Co.*, 221 N. Y. 28.

"Europe, however, was an employee within the meaning of § 3, subd. 4, employed in a business or enterprise classified as hazardous, because it employed regularly four workmen or operatives. The evidence permitted the finding that the four men above named did manual work, consisting of moving scenery, arranging the stage, handling baggage, and cleaning and pressing clothes.

" Why the legislature should have extended by the second group of subdivision 45 the hazardous employments to any employment having four workmen or operatives is not for us to say. The courts, in construing statutes, are not concerned with the wisdom of the legislation. *Wilson v. C. Dorflinger & Sons,* 218 N. Y. 84, 86.

" We do not think, however, that the legislature has exceeded its powers of classification by this extension of hazardous employments. It may be, as above intimated, that a business not ordinarily hazardous becomes such at times when manual work is done or machinery operated in connection with its main purpose.

" Whether or not the legislature can extend the benefits of compensation to all employments irrespective of workmen's hazards we are not called upon, at this time, to decide."

Apparently former opinions of this court have upheld workmen's compensation acts against the claim that they destroy the right freely to contract and thereby deprive of property without due process of law upon the theory that the State may charge pecuniary losses arising from personal injuries against the industry, when men are employed in hazardous occupations for gain. If " hazardous occupations " is not a mere empty phrase, there must be real hazard—legislative declaration is not enough. And hazard is something more than the mere possibility of injury which is always present.

Opinions of the court below have so construed the challenged provisions that if a merchant while employing five hundred clerks in New York City, no one of them within the Workmen's Compensation Act, should employ four workmen to paint signs or nail up boxes at Buffalo, all his clerks would immediately come under the act. The occupation of a clerk stationed in New York City cannot be rendered hazardous simply because four workmen are employed at Buffalo. To argue that an occupation is

hazardous because some one engaged therein has received personal injuries is not helpful. Many have suffered fatal accidents while eating, but eating could hardly be called hazardous. If, as suggested by the court below, " it was considered a risk to be in an employment where four or more manual laborers or operatives were engaged" irrespective of anything else, then the assumption is contrary to common experience.

If the State has power to declare an employer liable whenever his employee is injured, irrespective of hazard, the discussions heretofore indulged which treated hazard as important were unfortunate and misleading. But if that element can be wholly disregarded, then consideration must be given to the classification adopted by the New York statute in its relation to the equal protection clause. As often declared, classification is permissible when rational. But what possible reason is there for imposing liability in favor of a hundred employees otherwise outside of the compensation statute simply because their employer has found it desirable to hire four men to do manual work in a shop or dig trenches miles away from the only place where the hundred serve?

Such cases as *Jeffrey Manufacturing Co.* v. *Blagg*, 235 U. S. 571, and *Middleton* v. *Texas Power & Light Co.*, 249 U. S. 152, are not pertinent. The classifications there approved rested upon the obvious truth " that the negligence of a fellow servant is more likely to be a cause of injury in the large establishments, employing many in their service, and that assumed risk may be different in such establishments than in smaller ones," or upon some other distinction declared to be " sufficiently patent, simple and familiar."

In the present case it is said that the plaintiff in error may be put into a peculiar group and required to compensate Krinsky solely because he employed mechanics to hammer at a bench miles away from the station where

Krinsky sold papers, magazines, candy and chewing gum, and sometimes applied a little soap and water to his hands. I think both the due process and equal protection clauses of the Amendment forbid.