LESLIE H. JAMOUNEAU, PLAINTIFF-APPELLANT, v. CLAIRE E. HARNER AND ESSEX COUNTY RENT CONTROL BOARD, DEFENDANTS-RESPONDENTS, AND GROVER C. RICHMAN, Jr., ATTORNEY-GENERAL OF NEW JERSEY, INTERVENOR-RESPONDENT.

Argued October 4, 1954—Decided November 22, 1954.

501

504

*Mr. Saul A. Wittes* argued the cause for appellant.

*Mr. Thomas J. Brogan* argued the cause for Property Owners Protective Association,. Inc., *amicus curiae.*

*Mr. Harry Weltchek* argued the cause for James E. Bryan and Alice S. Bryan, *amici curiae.*

*Mr. Joseph A. Murphy,* Assistant Deputy Attorney-General, argued the cause for defendant respondents and intervenor respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General, and *Mr. Chester K. Ligham,* Deputy Attorney-General, attorneys for intervenor-respondent; *Mr. Marshall Crowley,* attorney for the respondent Essex County Rent Control Board; *Messrs. Bell & Adubato,* attorneys for the respondent Harner).

The opinion of the court was delivered by

HEHER, J. The basic issue here is the constitutional sufficiency of the State Rent Control Act of 1953, *c.* 216, *N. J. S.* 2*A* :42–14 *et seq.*, entitled "An Act providing for the regulation of rents and possession of housing space, with respect to certain properties in certain municipalities, making an appropriation and repealing" the Rent Control Act of 1950, *c.* 234.

The act of 1953 has a preamble reciting that (1) "A serious public emergency exists in certain areas of this State due to continued shortage of rental housing space"; (2) "Rent control is essential to the health, safety and general welfare of the people of this State"; and (3) "Federal rent control is presently due to expire" on July 31, 1953, "and the enactment of an adequate State rent. control law, to become operative upon the termination of Federal rent control, is imperative." The act expires by its own limitation on December 31, 1954.

The immediate controversy concerns the relation between the plaintiff landlord and the defendant tenant Harner arising by contract made between them March 1, 1952 for a tenancy from month to month of the first-floor southwest suite in an apartment house No. 74 Lenox Avenue, in East

Orange, New Jersey, in plaintiff's ownership, then subject to federal rent control under the Emergency Price Control Act of 1942, 50 *App. U. S. C. A.*, sec. 901 *et seq.*, and the Housing and Rent Act of 1947, as amended, 50 *App. U. S. C. A.*, sec. 1881 *et seq.*, which expired by its own limitation in the particular area at midnight July 31, 1953. Under federal control, the permissible maximum rent was $60 per month until August 29, 1951, when it was increased to $72 per month by an order made September 4, 1951 by the Federal Area Rent Director pursuant to the power conferred by the cited federal statutes, and this order was still effective at the close of July 31, 1953. There has been no change in the maximum rent thus prescribed, either by the federal authority during its incumbency or by the state authority since it assumed rent control under the cited state act on August 1, 1953, and there has been no application for a modification of the fixed maximum, either by the plaintiff landlord or the defendant tenant. Notwithstanding the maximum of $72 per month permissible after September 4, 1951, the contract between the parties established the rent at $65 per month; and rent at this rate was paid until August 1, 1953, when the plaintiff landlord served upon the defendant tenant notice either to pay rent at the rate of $72 per month commencing September 1, 1953, or vacate the premises as of that date, and the result was a new agreement between the parties, after action for possession brought in the Essex County District Court, fixing the monthly rental at $72, and discontinuance of the suit for possession.

Entertaining doubt as to the validity of the new rent charge, and having in view the violation forfeiture provided by section 25 of the State Rent Control Act of 1953, *N. J. S.* 2A :42–38, the landlord brought a civil action under the Uniform Declaratory Judgments Act, *N. J. S.* 2A :16–50 *et seq.*, in the Essex County District Court, naming the tenant and the Essex County Rent Control Board as defendants, for a declaration of his rights, status and legal relations under the tenancy, and in particular that the maximum monthly rental for the premises was "fixed" at $72

by the cited State Rent Control Act, and the agreement for the payment of rent at that rate was an enforceable obligation. By leave of court, the complaint was later amended to include the charge that, in the particulars to be adverted to, the state act constitutes an infringement of the State Constitution of 1947 and serves to deprive plaintiff of his property in disregard of section 1 of the Fourteenth Amendment to the Federal Constitution, and to demand, in the alternative, if the act be held valid, a declaration that section 19 of the state act, *N. J. S.* 2A:42–32, "fixes the lawful base rental for any housing space in existence at the close of July 31, 1953, at the maximum amount of rent lawfully payable therefor as of the close of July 31, 1953, under any orders, applicable to such housing space, then in effect by authority of the" Federal Housing and Rent Act of 1947, as amended, and thus, by force of the state act, "the present lawful rent" for the premises "is the maximum rent of $72 per month which was established" by the federal authority on September 4, 1951, and the particular tenancy agreement embodies the elements of an enforceable contract.

The Attorney-General moved for leave to intervene under *R. R.* 4:37–2, deeming it to be litigation involving the "interpretation and validity" of a "State regulation" under the State Rent Control Act; and the motion was granted.

Plaintiffs moved for summary judgment on the assumption that section 19 of the state act fixed the "lawful base rental" for the subject housing space at the "maximum amount of rental lawfully payable therefor" as of July 31, 1953 under the federal regulation, and so as a matter of law the rental agreement under review is legally sufficient. The Attorney-General moved for a dismissal of the complaint on the contrary hypothesis, and also on the additional ground that the "validity of the rules and regulations" of the State Director of Rent Control is the subject matter of the litigation and under *R. R.* 4:88–10 the review of an "administrative rule" of a state administrative agency can be had only by petition for a declaratory judgment addressed to the Appellate Division of the Superior Court.

Plaintiff's motion for summary judgment was denied, and the Attorney-General's motion to dismiss was granted, the findings state for want of jurisdiction. It was considered the "better practice," citing *Legg v. County of Passaic*, 122 *N. J. L.* 100 (*Sup. Ct.* 1939), for "the inferior court to assume an act is constitutional until it is passed upon by the appellate court, unless it is so clearly in contravention that there can be no doubt about it"; and the "rules and regulations defining the method of determining lawful base rentals" were held reviewable only by the Appellate Division of the Superior Court under *R. R.* 4:88–10.

Plaintiff's appeal to the Appellate Division from the consequent judgment of dismissal is here for decision by certification on our own motion.

Leave was given by the Appellate Division to Property Owners' Protective Association and James E. Bryan and Alice S. Bryan, as *amici curiae*, to brief and orally argue the issue of the constitutionality of the state act of 1953. Counsel treats the constitutional issue raised by the second count of the complaint as "an unadulterated question of law which must be determined and in which there is no factual dispute."

I

*As to jurisdiction*:

The plaintiff landlord seeks a determination of the "amount, if any, to which his lawful rent is restricted by the State rent control law"; and he urges that this inquiry involves "questions of construction and validity arising from the statute," such as are within the jurisdictional clause of the Declaratory Judgments Act, *N. J. S.* 2A:16–53, in terms inclusive of questions of this class. As just indicated, section 19 of the State Rent Control Act, *N. J. S.* 2A:42–32, equates the "lawful base rental" for the particular housing accommodations with the "lawful" rent "payable" for such space as of July 31, 1953, and directs that in the determination of the "amount of such base rentals, the orders, if any, then in effect under any federal rent control shall be taken

into consideration." The regulations promulgated under the authority granted by section 7 of the state act, *N. J. S.* 2A:42–20, defines "lawful base rent" or "lawful rent" as the "rent actually and legally charged, received, payable or due" for the given housing space "for the rental period ending on July 31, 1953, or the last period immediately prior thereto."

The contention is that the rent "payable" within the intendment of section 19 of the state act is the ceiling or maximum rent permissible under the federal regulations on July 31, 1953; and this is plainly a question of "construction and validity" arising under the state statute, cognizable under the express terms of section 53 of the Declaratory Judgments Act, a remedial measure designed, *N. J. S.* 2A:16–51, "to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." Compare *McCrory Stores Corporation v. S. M. Braunstein, Inc.,* 102 *N. J. L.* 590 (*E. & A.* 1926); *New Jersey Bankers Ass'n. v. Van Riper,* 1 *N. J.* 193 (1948); *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949); *Blackman v. Iles,* 4 *N. J.* 82 (1950); *Abelson's, Inc. v. New Jersey State Board of Optometrists,* 5 *N. J.* 412 (1950).

██ And the county district courts are "courts of record" thus empowered by section 2A:16–52. Although a court of limited rather than general jurisdiction, the county district court is nevertheless a court of record, for it proceeds in the main according to the course of the common law; it is not a special tribunal; it has power to determine its own jurisdiction, and the record of its proceedings and the judgment import absolute verity, and every intendment is made in favor of its judgments. These are the essential attributes of courts of record. *Hess v. Cole,* 23 *N. J. L.* 116 (*Sup. Ct.* 1851); *McPherson v. Cunliff,* 11 *Serg. & R.* 422 (*Pa. Sup. Ct.* 1824); *Fox v. Hoyt,* 12 *Conn.* 491 (*Sup. Ct. Err.* 1838); *In re Dean,* 83 *Me.* 489, 22 *A.* 385, 13 *L. R. A.* 229 (*Sup. Jud. Ct.* 1891); *Van Norman v. Gordon,* 172 *Mass.* 576, 53 *N. E.*

267, 44 *L. R. A.* 840 (*Sup. Jud. Ct.* 1899); *State v. Allen,* 117 *Ohio St.* 470, 159 *N. E.* 591 (*Sup. Ct.* 1927); *Commonwealth ex rel. Margiotti v. Sutton,* 327 *Pa.* 337, 193 *A.* 250 (*Sup. Ct.* 1937). And the county district courts are "courts of record" by force of the creative statute itself. *N. J. S.* 2A:6–7.

The circumstances here—the treble forfeiture, the continuing penalty, and the public interest in adherence to the policy—all make a strong case for the exercise of judicial discretion for a prompt adjudication of the issue.

The Attorney-General suggests that the administrative regulation adverted to may be tested only by a proceeding in the Appellate Division under *R. R.* 4:88–10, and within the time limited by *R. R.* 4:88–15. But the validity of the regulation of necessity turns upon the sense and significance of the statute; and, recognizing this, the Attorney-General does not object to a consideration of the administrative rule "in conjunction" with the questions concerning the meaning of the particular statutory provision and the constitutional integrity of the Act, and concedes there is a "justiciable controversy under the facts of the case."

## II

*The statute:*

If words are to be given their normal usage, the statutory concept of the "lawful" rental "payable" July 31, 1953, as the "lawful base rental" for such housing space, must of necessity be the rental actually payable by the contract of the parties within the maximum established by the federal regulation, and not the maximum itself. The distinction is between "payable" and "permissible." The adjective "payable" has reference to that which is to be paid; justly due; legally enforceable. A sum of money is said to be payable when a person is under obligation to pay it. *Black's Law Dictionary* (*4th ed.*). A thing is permissive or permissible when it can be permitted; allowable; not forbidden; that which may be done. *Webster's International Dictionary* (*2d ed.*). A rental payable under the contract,

short of the rent ceiling prescribed by the law, represents the parties' own assessment of the rental value of the housing accommodations; and this constitutes the "lawful rental base" for the purposes of the state act. The injunction of section 19 to take "into consideration," in determining the amount of such base rentals, the order of the federal rent control "then in effect" is merely a ceiling limitation. In fine, the agreed rental cannot exceed the fixed maximum. The maximum is the ceiling, not the rent payable in the given case.

 This construction is not violative of the interpretive canon that all provisions of a statute are to be related and effect given to each if that be reasonably possible. Such is the meaning of "payable" in context; it is not reasonably susceptible of the interpretation "that may be paid" or "capable of being paid." Any doubt as to this is dispelled by the concluding provision of section 19 that for "premises constructed or first rented after" July 31, 1953, the amount of the "lawful rentals" for housing space shall be the rentals "lawfully payable" as of "the date of the first payment of rent" for such housing space. This clause makes clear the legislative understanding of the term "payable." The sense in which the words of a statute were intended to be used is to be gleaned from the context. Words of common use are to be taken in their natural, plain, obvious and ordinary signification, save as modified by the context. *Fedi v. Ryan,* 118 *N. J. L.* 516 (*Sup. Ct.* 1937).

## III

*Constitutional limitations:*

We are thus brought to a consideration of the questions involving the organic law.

First, the state act is assailed by the plaintiff landlord as wanting (a) in a declaration of emergency "contained in the Act" itself; (b) "mention" of an existing emergency in the title; and (c) the actual existence of a housing shortage sufficient to support a legislative declaration of an emergency.

The maxim *salus populi suprema est lex* embodies a principle, of the essence of the police power, that from early times has been deemed basic to all civil government. The welfare of the people is the supreme law. *Bac. Max. reg.* 12; *Broom, Max.* 1–10. The police power is the law of necessity; it extends, in the words of Justice Holmes, to all the great public needs; it may be exerted in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. *Noble State Bank v. Haskell,* 219 U. S. 104, 31 *S. Ct.* 186, 55 *L. Ed.* 112 (1911). An emergency is an unusual public exigency calling for the exercise of the police power to alleviate the common peril or need; and the inquiry in all such cases is whether in right reason the public urgency sustains the remedy invoked. Is the legislation addressed to a legitimate end, and are the measures taken reasonable and appropriate to that end? Emergency does not create or enlarge the remedial power; but it may furnish the occasion for its exercise in the essential common interest. *Home Building & Loan Ass'n v. Blaisdell,* 290 U. S. 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413, 88 *A. L. R.* 1481 (1934).

The basic right of private property perforce yields to an overriding public need. There is an ever-increasing demand for accommodation of the right of property and of contract to the inexorable needs and pressures of our complex economy and intricate social organism. The vital community interest is paramount. Utility rate contracts give way to this attribute of sovereign power; and the contractual arrangements between landlords and tenants as well. The determinative question is whether the police power has been exercised for an end which is in fact public. *Veix v. Sixth Ward B. & L. Ass'n of Newark,* 310 U. S. 32, 60 *S. Ct.* 792, 84 *L. Ed.* 1061 (1940); *Edgar A. Levy Leasing Co. v. Siegel,* 258 U. S. 242, 42 *S. Ct.* 289, 66 *L. Ed.* 595 (1922); *Block v. Hirsh,* 256 U. S. 135, 41 *S. Ct.* 458, 65 *L. Ed.* 865 (1921); *Marcus Brown Holding Co. v. Feldman,* 256 U. S. 170, 41 *S. Ct.* 465, 65 *L. Ed.* 877 (1921). And a law that depends

on the actuality of an emergency or a particular state of facts giving rise to the exercise of the power may lose its efficacy when the basic factual conditions no longer obtain.

The existence of an urgent public need due to housing scarcity is in its very nature for the determination of the legislative authority; but the declaration of an emergency is not conclusive, and the finding as well as the continuance of the exigency upon which the operation of the law depends are subject to judicial inquiry. *Home Building & Loan Ass'n v. Blaisdell*, cited *supra; Hourigan v. North Bergen Township*, 113 *N. J. L.* 143 (*E. & A.* 1934). Compare *Woods v. Cloyd W. Miller Co.*, 333 *U. S.* 138, 68 *S. Ct.* 421, 92 *L. Ed.* 596 (1948). Yet the Legislature has a broad discretion in assessing the need and the means requisite for the protection of the common weal; and fairly debatable questions of policy and procedure are resolved in favor of the power. *Sproles v. Binford*, 286 *U. S.* 374, 52 *S. Ct.* 581, 76 *L. Ed.* 1167 (1932) ; *Stephenson v. Binford*, 287 *U. S.* 251, 53 *S. Ct.* 181, 77 *L. Ed.* 288 (1932) ; *Abelson's Inc. v. New Jersey State Board of Optometrists*, cited *supra; Reingold v. Harper*, 6 *N. J.* 182 (1951) ; *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (*E. & A.* 1935).

There is a presumption of the constitutional sufficiency of a legislative enactment; and the onus of a showing *contra* is on him who interposes the challenge. *Hart v. Scott*, 50 *N. J. L.* 585 (*E. & A.* 1888) ; *State v. Dolbow*, 117 *N. J. L.* 560 (*E. & A.* 1937) ; *Sears, Roebuck & Co. v. Camp*, 124 *N. J. Eq.* 403 (*E. & A.* 1938). The finding of the Legislature is presumed to have the support of facts known to it "unless facts judicially known or proved preclude that possibility"; generally, it is "not the province of a court to hear and examine evidence for the purpose of deciding again a question which the legislature has already decided"; its function "is only to determine whether it is possible to say that the legislative decision is without rational basis." *Clark v. Paul Gray*, 306 *U. S.* 583, 59 *S. Ct.* 744, 83 *L. Ed.* 1001 (1939). Every intendment is indulged in favor of the validity of the act. It is to be assumed that the act was

directed to an exigency made manifest by experience, and the remedy was in accordance with the known need. *Ward & Gow v. Krinsky*, 259 *U. S.* 503, 42 *S. Ct.* 529, 66 *L. Ed.* 1033 (1922). These principles are largely applicable to local legislative acts in the exercise of a delegated police power. *New Orleans Public Service v. City of New Orleans*, 281 *U. S.* 682, 50 *S. Ct.* 449, 74 *L. Ed.* 1115 (1930).

The Legislature made known its finding of a "serious public emergency" in "certain areas" of the State, growing out of a continued housing shortage, and the imperative need of state rent control to become operative upon the cessation of federal rent control. This by means of a preamble, a time-honored legislative prefatory device explanatory of the reasons for the law and the objects in view. There is no constitutional principle or peremptory legislative practice ordaining a declaration of the underlying emergency in the purview of the act. Relating as it does to the need for the legislation, and not in itself an act of legislation, the finding is in no sense a constituent element of the enacting clause. Compare *Lane Distributors, Inc. v. Tilton*, 7 *N. J.* 349 (1951). The preamble evidences the facts which it recites. *Ex parte Kelly*, 123 *N. J. Eq.* 489 (*Ch.* 1938), affirmed *sub nom. McRell v. Kelly*, 124 *N. J. Eq.* 350 (*E. & A.* 1938). The enacting clause of a statute may be extended by the preamble, but cannot be restrained by it. *Brown v. Erie R. Co.*, 87 *N. J. L.* 487 (*E. & A.* 1914). And, by the same reasoning, it is not required legislative procedure that there be "mention" of the emergent conditions in the title. Here, the nature of the power invoked and the grounds for its exercise are also evident in the terms of the purview.

Nor is there a showing that the declared housing shortage was and is in fact nonexistent. The point is that six towns "abutting or closely neighboring East Orange, *viz:* South Orange, Glen Ridge, Bloomfield, West Orange, Maplewood and Montclair, have not invoked" the act; and the reasoning is that this is conclusive proof, "not only that there is no shortage of housing in these six towns, which provide housing for 169,890 persons adjoining or in close proximity to East

Orange," itself having a population of 79,340, "but also that there is no real or substantial housing shortage in East Orange," since all of these towns "are part of a single residential community, and the flow of tenants from one town to another is as fluid and unobstructed as it would be within any single place," and "Any East Orange tenant who is dissatisfied with housing accommodations in that city, whether because of scarcity or for any other reason, is free to move to any of the other towns, where it must be assumed that housing is in adequate supply and reasonably priced, for otherwise these towns would have adopted rent controls long before this." The conclusion is that there "can be no shortage in a town which does not also exist in the surrounding towns which with it make up a single common community."

But this is a *non sequitur*. The assumption is ill-founded. The Legislature found a public emergency in "certain areas" of the State; and it sought to reach these areas by providing for rent control, section 28, *N. J. S.* 2A:42–41, "operative in any municipality in which the governing body shall adopt a resolution reciting that there is a housing space shortage therein and that rent control is required in such municipality for the protection, safety, health and general welfare of the people of such municipality." A copy of such resolution "shall be published, prior to its adoption, at least once in one or more newspapers published or circulated" in the municipality. This was done here; but no objection was interposed, nor was there a demand for a hearing to determine the propriety of the proposed action, or for a judicial review after the adoption of the resolution. And there is provision, section 29, *N. J. S.* 2A:42–42, for decontrol and recontrol by the self-same process.

This would seem to be an eminently practical way of covering the areas of the State in need of rent control, and thus to avoid state-wide control in excess of the need and the attendant risks of going beyond the reasonable limits of the power. At all events, such was deemed to be the prudent course by the legislative authority, and the choice of means resided there, subject to judicial inquiry only for arbitrary

action. And we find no abuse of the power. There is no basis whatever for holding that migration would solve the problem; and, moreover, the power may not in good reason or logic be thus confined to cases where the housing shortage is irremediable by movements of population out of the troubled area. Other considerations aside, population shifts make for social and economic dislocations in themselves inimical to the public welfare. It is proved that factual findings by the local governing bodies have brought rent control in communities representing 75% of the aggregate population of Essex County and 54% of the whole population of the State. For want of a showing *contra,* the public emergency declared by the preamble must be assumed to exist. *Block v. Hirsh,* cited *supra.* Compare *People ex rel. Durham Realty Corporation v. La Fetra,* 230 *N. Y.* 429, 130 *N. E.* 601, 16 *A. L. R.* 152 (*Ct. App.* 1921).

And these considerations render untenable the point that for the same reason,—*i. e.* that "as an effect of the law," there is rent control in East Orange, but not in the six surrounding municipalities, "all of which are part of a single, natural, residential community," the statute in its operation offends against the due process and equal protection clauses of the Fourteenth Amendment, and takes private property for public use without just compensation.

True, as observed in *Washington National Insurance Co. v. Board of Review,* 1 *N. J.* 545, 549 (1949), cited by appellant, equality of right is fundamental in both the due process and equal protection guaranties. But this assurance of like treatment to all persons similarly situated is not violated by classification which is reasonable and not arbitrary, in that it rests upon substantial differences fairly related to the public purpose to be served. Where the end is one to which legislative power may properly be addressed, it is enough "if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end." *Stephenson v. Binford,* cited *supra.* An exercise of the police power is not to be struck down as in contravention of the due process and

equal protection clauses, "unless it be palpably unreasonable or unduly discriminatory"; and fairly debatable questions as to need and the propriety of the means employed to meet the exigency are within the legislative province. *Reingold v. Harper,* cited *supra.* Said Chief Justice Hughes:

"To make scientific precision a criterion of constitutional power would be to subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the 14th Amendment was intended to secure. * * * When the subject lies within the police power of the State, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome."

*Sproles v. Binford,* cited *supra.* It is settled, said Chief Justice White long ago, "as the essential result of the elementary doctrine that the equal protection of the law clause does not restrain the normal exercise of governmental power, but only abuse in the exertion of such authority, therefore that clause is not offended against simply because, as the result of the exercise of the power to classify, some inequality may be occasioned. That is to say, as the power to classify is not taken away by the operation of the equal protection of the law clause, a wide scope of legislative discretion may be exerted in classifying without conflicting with the constitutional prohibition." *Louisville & N. R. Co. v. Melton,* 218 *U. S.* 36, 30 *S. Ct.* 676, 54 *L. Ed.* 921 (1910).

■■ The question is whether the distinctions are fairly in keeping with the object and purpose of the law. While the power of the State to distinguish, select, and classify objects of legislation is not without limitation, "necessarily this power must have a wide range of discretion. * * * There is therefore no precise application of the rule of reasonableness of classification, and the rule of equality permits many practical inequalities. And necessarily so. In a classification for governmental purposes there cannot be an exact exclusion or inclusion of persons and things." *Magoun v. Illinois Trust & Savings Bank,* 170 *U. S.* 283, 18 *S. Ct.* 594, 42 *L. Ed.* 1037, 1043 (1898). Classification by legislation

"is not invalid because not depending on scientific or marked differences in things or persons or in their relations. It suffices if it is practical, and is not reviewable unless palpably arbitrary." *Orient Insurance Co. v. Daggs*, 172 *U. S.* 557, 19 *S. Ct.* 281, 43 *L. Ed.* 552 (1899). The constitutional command, said Mr. Justice Black, "for a state to afford 'equal protection of the laws' sets a goal not attainable by the invention and application of a precise formula. This Court has never attempted that impossible task. A law which affects the activities of some groups differently from the way in which it affects the activities of other groups is not necessarily banned by the Fourteenth Amendment. * * * Otherwise, effective regulation in the public interest could not be provided, however essential that regulation might be. For it is axiomatic that the consequence of regulating by setting apart a classified group is that those in it will be subject to some restrictions or receive certain advantages that do not apply to other groups or to all the public. * * * This selective application of a regulation is discrimination in the broad sense, but it may or may not deny equal protection of the laws. Clearly, it might offend that constitutional safeguard if it rested on grounds wholly irrelevant to achievement of the regulation's objectives." *Kotch v. Board of River Port Pilot Commissioners*, 330 *U. S.* 552, 67 *S. Ct.* 910, 91 *L. Ed.* 1093 (1947).

It is not possible to lay down an "infallible or all-inclusive" test by which it may be determined whether "a given difference between the subjects of legislation is enough to justify the subjection of one and not the other to a particular form of disadvantage"; the nearest approach to a definite rule is that "while the difference need not be great, the classification must not be arbitrary or capricious, but must bear some just and reasonable relation to the object of the legislation"; a particular classification is not invalidated by the Fourteenth Amendment "merely because inequality actually results"; every classification of persons or things tor regulation by law "produces inequality in some degree," but the law "is not thereby rendered invalid, unless the

inequality produced be actually and palpably unreasonable and arbitrary." *Bayside Fish Flour Co. v. Gentry*, 297 *U. S.* 422, 56 *S. Ct.* 513, 80 *L. Ed.* 772 (1936).

 The Fourteenth Amendment "does not prohibit legislation merely because it is special, or limited in its application to a particular geographical or political subdivision of the state." *Fort Smith Light & Traction Co. v. Board of Improvement of Paving District*, 274 *U. S.* 387, 47 *S. Ct.* 595, 71 *L. Ed.* 1112 (1927). It suffices if the regulation be of general application within the territory of its operation. A statute authorizing municipalities to abate the smoke nuisance does not give rise to an arbitrary classification in defiance of the equal protection clause "because certain cities are included and others omitted in the statute." *Northwestern Laundry v. City of Des Moines*, 239 *U. S.* 486, 36 *S. Ct.* 206, 60 *L. Ed.* 396 (1916). In a case reviewing an ordinance barring the operation of a brickyard within described limits in a city, Mr. Justice McKenna, adverting to the requirement that the exercise of the police power be free from arbitrary action, said:

"The principal is familiar, but in any given case it must plainly appear to apply. It is to be remembered that we are dealing with one of the most essential powers of government,—one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. * * * It may be that brickyards in other localities within the city where the same conditions exist are not regulated or prohibited, but it does not follow that they will not be." *Hadacheck v. Sebastian*, 239 *U. S.* 394, 36 *S. Ct.* 143, 60 *L. Ed.* 348 (1915).

Where the regulation, in itself not unreasonable and arbitrary, operates uniformly upon all persons similarly situated in the particular district, the district itself (within a municipality) not appearing to have been arbitrarily selected, it cannot be judicially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the laws, within the meaning of the Fourteenth Amendment. *Reinman v. City of Little Rock*, 237 *U. S.* 171, 35 *S. Ct.* 511, 59 *L. Ed.* 900 (1915), Pitney, J.

Here, there is no suggestion of artifice or oppression; there can be no doubt that the particular regulation constitutes a *bona fide* endeavor to alleviate, by practical means, conditions reasonably deemed prejudicial to vital socio-economic interests, a field that in its nature involves great freedom of discretion. And the neighboring communities may well find the need for like action; presumably, none exists now. At all events, the record does not make a showing of arbitrary classification or an illusory application of the statutory policy.

But it is urged that, even so, the "Act subjects the operation of a State law to local control without requirement for proper public notice, and with no requirement for public hearing," a delegation of power deficient in "certain procedural requirements which are constitutionally necessary to preserve due process of law and the equal protection of the laws." This has reference to sections 28 and 29, *N. J. S.* 2A:42–41, 42. As stated *supra*, there is provision for the advance publication of the proposed operative resolution.

The province of the local governing body is the fulfillment of the categorically declared legislative policy. Such regulation is purely a legislative function; and even when the power is exercised through a designated subordinate agency the hearing on notice essential to judicial proceedings is not indispensable. If the regulation undertaken be arbitrary or unreasonable, then ample relief may be had in the judicial forum; and thereby the demand of the due process clauses is satisfied. *State Board of Milk Control v. Newark Milk Co.*, cited *supra*.

The Legislature would not be under a duty to give notice and provide a hearing were it directly to fix rents on a state-wide basis or in particular areas of the State where the need was manifest. And in the federal jurisdiction the Congress need not lay down that requirement when it delegates the function to an administrative agency; it suffices if there be a judicial review of the administrator's action. Where only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the

opportunity given for the ultimate judicial determination of the issue be adequate; delay in the judicial determination of property rights is ofttimes unavoidable where it is essential that governmental needs be immediately satisfied. And so, Mr. Justice Douglas distinguished the cases typified by *Morgan v. United States*, 304 *U. S.* 1, 58 *S. Ct.* 773, 82 *L. Ed.* 1129 (1938), as treating of statutes requiring that procedure, and not involving "the exigencies of wartime conditions and the insistent demands of inflation control," whereas in the case there under consideration the Congress chose not to fix rents in specified areas or on a national scale by legislative fiat, but to provide a method "designed to meet the needs for rent control as they might arise and to accord some leeway for adjustment within the formula which it prescribed," and at the same time avoid "lengthy and costly trials" before the rent control order could be made effective and the delay which "might have defeated the program of price control." *Bowles v. Willingham*, 321 *U. S.* 503, 64 *S. Ct.* 641, 88 *L. Ed.* 892 (1944). We may well have recourse to Mr. Justice Holmes' exposition of the principle:

"Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 *U. S.* 441, 36 *S. Ct.* 141, 60 *L. Ed.* 372 (1915).

But it is insisted that the act "relegates the operation of a state law to local option without the sanction of a popular referendum," in contravention of the principle of *Attorney-General v. McGuinness*, 78 *N. J. L.* 346 (*E. & A.* 1910). The *amici curiae* maintain that that case sustains the thesis that it is fundamental in the State Constitution that the "legislative will may be imposed as law upon municipalities," but if "any other will is to intervene between the Legislature

and the municipalities, it must be the will of the people themselves and not an alien will," and the "grant of the power to exercise the option to any other body," even the local governing body, constitutes "the intervention of an alien authority and renders the legislation void." But that doctrine has no pertinency here.

There, the Court of Errors and Appeals, following *President and Council of City of Paterson v. Society for Establishing Useful Manufactures*, 24 *N. J. L.* 385 (*Sup. Ct.* 1854), and overruling *De Hart v. City of Atlantic City*, 62 *N. J. L.* 586 (*Sup. Ct.* 1898), held that "a statute in the nature of a supplemental charter that is enacted to take effect upon its adoption by the governing body of a municipality is not a constitutionally enacted law." This on the hypothesis of the first-cited case that the submission of the charter provisions of a municipal corporation to the "would-be corporations" would not infringe the constitutional principle that "legislation cannot be directly exercised by the people," inasmuch as "neither the propriety of the provisions themselves as proper municipal regulations nor the expediency of granting or tendering a charter containing these provisions" to the municipality, the only legislative questions involved, was submitted to the people, and, though the legislative will may be imposed as law upon the municipalities, "if any other will is to intervene between the legislature and such municipalities, it must be the will of the people who are to be governed by such law and not an alien will, even though it be that of the governing body for the time being of the municipality." Such submission of charter provisions, it was declared, is not to the inhabitants "as a part of the sovereign people but simply as corporators"; their affirmative vote is "an act of acceptance not of legislation"; and the "acceptance of the statute" is "not an act of lawmaking or the action of lawmakers or of a lawmaking body"; from a constitutional standpoint, "the acceptance by a municipal corporation of the provisions of a legislative act is one thing," and "the delegation of legislative power to municipal corporations is quite another and different thing."

Of the former—*i. e.* "referendum statutes," *President and Council of City of Paterson v. Society for Establishing Useful Manufactures,* cited *supra,* is the leading example; of the latter—*i. e.* "statutes delegating powers of local government," *Paul v. Gloucester County,* 50 *N. J. L.* 585 (*E. & A.* 1888), is distinctive. Justice Van Syckel there said:

> "The validity of this law may be rested securely upon the right of the legislature to delegate the power of local government to political subdivisions of the state."

In a word, the distinction is between the delegation of legislative power upon all municipalities of a given class, exercisable like all legislative power by the governing bodies of such municipalities, and the conferring of no power at all except upon those municipalities which shall adopt the act. The difference is between *acceptance* and the *exercise* of legislative power.

In a later case, the "basic and fundamental principle" of the *McGuinness* case was assessed thus: "A critical reading of the decision" there "leads irresistibly to the conclusion that a statute in the nature of a supplemental charter, which cannot take effect unless through the exercise of a discretion or of a will intervening between the legislature and the voter, is not a constitutionally enacted law." *McCarthy v. Walter,* 108 *N. J. L.* 282 (*E. & A.* 1931). See, also, *Hartman v. Board of Chosen Freeholders,* 127 *N. J. L.* 170 (*Sup. Ct.* 1941).

Here, the statute does not concern acceptance of a proffered supplement to a local corporate charter, but rather the exercise of the police power in the fulfillment of the State's policy of relief from the socio-economic evils of critical area shortages of housing accommodations. The act provides for administration of the policy on the county level, under state regulation and supervision, in all municipalities whose governing bodies shall find a local housing space shortage making rent control imperative for the "protection, safety, health and

general welfare of the people" of the particular municipality, of and by itself an integral part of the exercise of the police power under delegation by the Legislature to all municipalities alike, exercisable if and when the specified public urgency comes into being, indeed an essential use of the power if the legislative policy is to be realized—subordinate legislation, as it were, controlled by a definitive statutory standard. When the nature of the power is considered, the question is readily resolved.

The rule-making power conferred upon the State Director by sections 7 and 9 of the statute, *N. J. S. A.* 2A :42–20, 22, is contained by certain and definite standards therein laid down, as a means of furthering the central policy of the legislation; and so, without necessarily suggesting that these measures, and the regulations promulgated in the purported exercise of the power, are in all respects legally sufficient, there is ample statutory specification to sustain the grant against the contention of an unlawful delegation of legislative power. We are not obliged now to assess the regulations individually for legal soundness.

The *amici curiae* argue that section 16(*h*) of the act, *N. J. S. A.* 2A :42–29(*h*), bars "any general rent increase unless the landlord's annual operating expenses," as defined in section 17(*e*)(4), "are greater than 75% or 80% of the landlord's annual income," as defined in section 17(*e*)(3), and is therefore not "a provision for a 'fair and equitable' rent." The regulation is assailed as penalizing a landlord's efficiency in keeping operating expenses below 80% of the gross income from the particular building, by denying him a "rent increase." It is said that the landlord "who spends more time in lessening his costs is precluded from realizing the fruits of his labors, while a landlord who is not so frugal and lets his expenses rise needlessly may get a rent increase; all he need show is that the expenses are 'necessary to the operation and maintenance of the building,'" referring to section 17(*e*)(4), cited *supra*.

This is not a realistic assessment of these statutory provisions. We are here concerned with the constitutional

integrity of the statute itself, 'not the administration of the statutory policy.

The obvious design of the act is the accommodation of the public interest and the landlord's right of private property by the principle of a fair and equitable rental return to the landlord. Such is the indubitable reason of the law. The rule-making power concerns the effectuation of the "purposes" of the act. The grant relates, *inter alia*, section 7(*b*), (*e*), *N. J. S. A.* 2*A*:42–20, to "the control of rents within specified areas of operation consistent with the purposes" of the Act, "economic conditions and the protection of the public," and "the prevention of manipulative and speculative practices and rental and leasing practices which tend to unreasonably increase rentals."

Rent increases are allowable, by means of the procedures laid down in the act, including a hearing on notice and appellate review, section 16, *N. J. S. A.* 2*A*:42–29, to compensate the landlord (a) "for increases" in operative and maintenance costs; (b) a "major improvement to the dwelling unit which is more than ordinary repair and maintenance"; (c) for an "increase" in services or equipment, and the like: and on a showing (d) that the rent being paid "is substantially lower than the rent being paid for comparable dwelling units in the area or subarea"; (e) that the tenant has increased the number of subtenants or roomers in the rented dwelling unit; (f) that the premises are being occupied by "more than a normal number of persons" as a result of the tenant's "allowing additional relatives or other persons" to reside in the unit "as members of his household or otherwise"; or (g) "special or unusual circumstances" making it "impossible to safely maintain and operate the building without additional rental"; and then, in the disjunctive, comes subdivision (h), heretofore adverted to, providing for such relief where the "net operating income from the building is less than a fair net operating income (the net operating income shall not be considered less than fair if it is 25% or more of the annual income in the case of a building containing less than five dwelling units or is 20%

or more in the case of a building containing five or more dwelling units)." The adjustment under this subsection shall be in "such amount as is necessary to bring the net operating income from the building (expressed as a percentage of annual income after adjustment) to the median net operating income of landlord's generally"; and where the building falls within a class which "normally experienced considerably lower percentages of net operating income than the median," the "amount of adjustment may be determined on a basis" yielding "a lower percentage of net operating income than the median and which would be fair and equitable for that class of buildings." The county rent control agency and the county rent control review board are enjoined, section 17, *N. J. S. A.* 2*A*:42–30, to take into account, in determining applications for a rent increase, taxes, costs of operation and maintenance, the kind, quality and quantity of the services "furnished or withheld," and "other relevant and material facts."

And these administrative considerations and standards, designed to effectuate the statutory policy, govern also in the exercise of the rule-making function. The power is not without limitation. The legislative principle thus declared embodies the primary standard or rule of action, and the terms of the delegation control the exercise of the power to that end; and thereby constitutional requirements are satisfied. Out of these provisions, singly and as an integrated whole, emerge the ruling principle and policy and the implementing standard of subordinate action, clear and unmistakable. The metes of administrative action are charted with reasonable certainty. The terms of the grant have the requisite definitive quality. *State Board of Milk Control v. Newark Milk Co.*, cited *supra.*

The contention of constitutional infirmity has not been sustained.

The judgment dismissing the complaint, molded into a judgment for defendants on the merits in conformity with this opinion, is affirmed; and the cause is remanded for proceedings accordingly.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Chief Justice VANDERBILT—1.