CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks direct review, pursuant to N.J.S.A. 54:3-21, of the 1981 and 1982 assessments on its property located at 85-111 Passaic Avenue, Passaic Avenue and Riverfront and Passaic Avenue in Kearny, New Jersey (Block 1, Lots 13, 14 and 15). The assessments for both years were:
Lot 13 Lot 14 Lot 15
Land $ 96,100 $ 116,300 $293,300
Improvements 10,500 1,325,300 232,800
Total $106,600 $1,441,600 $526,100
No appeal was taken from the 1981 assessment on Lot 13. While the parties have agreed that all three lots constitute a single economic unit and may be so valued, the court cannot review the 1981 assessment on Lot 13, as no complaint was filed with respect thereto. It is too late to amend plaintiffs 1981 complaint to add a count pertaining to Lot 13. Newark v. Fischer, 3 N.J. 488, 70 A.2d 733 (1950); Prospect Hill Apt’s v. Flemington, 172 N.J.Super. 245, 1 N.J.Tax 224, 411 A.2d 737 (Tax Ct.1979); Mayfair Holding Corp. v. North Bergen Tp., 4 N.J.Tax 38 (Tax Ct.1982). The parties agree, however, that the subject property is to be valued in its entirety for 1981, with a reduction made for Lot 13 proportionate to the relationship of the assessment of that lot to the total original assessment.
The subject of the controversy is a complex of buildings devoted to commercial retail uses, dominated by a one-, two- and three-story structure, a former Two Guys from Harrison discount-department store, containing 224,126 square feet. The other structural improvements, all free standing, consist of a car wash (1,020 square feet), a service station and automotive-parts store (8,062 square feet), a produce market (2,638 square feet) and a Burger King fast-food outlet (3,000 square feet). Other improvements are a paved parking lot, steel mesh fencing, curbing, light standards and a retaining wall by the Passaic River. The total land area is 15.05 acres, of which 2.89 acres *371 are ascribable to Lot 13. The site abuts the Passaic River on the west.
The two- and three-story sections of the dominant structure were erected as an industrial building in 1926 and converted to commercial use in 1959, the same year the one-story section was added. This large building presently houses a flea market (known as the River View Market Place), a Channel Home Center and a retail optical outlet. It contains modern bathroom facilities, four escalators and two freight elevators. The building is fully sprinklered and heating, ventilating and air-conditioning (HVAC) for the entire building are supplied by gas and electric units. The large building housed a Two Guys discount-department store until the latter part of 1981, when the store closed and the property became vacant and remained so until October 1982.
The buildings on the subject premises were leased in the following manner:
1. Large building
(a) 191,978 square feet to River View Market Place, Inc. (the flea market):
10/14/82-4/13/85 @$430,000 annually
4/14/85-10/13/87 @ 535,000
10/14/87-4/30/90 @ 646,000
(b) 29,798 square feet to Channel Home Center:
6/10/82-1/31/88 @$134,091 annually
2/1/88-1/31/94 @ 156,439
2/1/94-1/31/99 @ 178,788
2/1/99-1/31/2004 @ 201,136
2/1/2004-1/31/2009 @ 223,485
Plus 2.5% of gross sales exceeding $4,469,700 annually
(c) 2,119 square feet to Nobel Optical, Inc.:
1/1/83-12/31/85 @ $35,300 annually
1/1/86-12/31/88 @ 44,138
*372 2.
Kearny Car Wash, Inc.
(a) 1,020 square feet
2/22/82-2/21/87 @$14,000 annually
2/22/87-2/21/92 @ 16,500
2/22/92-2/21/97 @ 20,625
2/22/97-2/28/2002 @ 25,781
3.
All Season Automotive
(a) 8,062 square feet - auto service & parts
10/1/81-7/14/82 @$19,500 annually
7/15/82-7/14/87 @ 50,387
7/15/87-9/14/92 @ 56,434
7/15/92-7/31/97 @ 64,496
Plus 5% of gross sales in excess of $390,000 annually (to 7/ 14/82); 5% of gross sales in excess of $1,007,750 annually (from 7/15/82)
4.
Hi Fruit & Produce, Inc.
(a) 2,638 square feet (fruit & vegetable market)
7/18/82-1/31/86 @$26,380 annually
Burger King leased one acre of land for four 5-year terms commencing August 1, 1979 for annual rentals in each term of $18,000, $23,000, $25,000 and $28,000, respectively. A fast-food outlet was erected on this site in 1980 at a cost of approximately $210,000, including all indirect costs.
The landlord is responsible for the repair and maintenance of the roof, the HYAC system, the parking area and the retaining wall along the river. The tenant is responsible for all other expenses including taxes.
The subject property is a heterogeneous collection of randomly placed buildings, constructed some years ago and used by the owner-occupant of the property for its own operations.
At issue are the true value of the subject property, whether the assessments are discriminatory and whether chapter 123, L. 1973, the legislative remedy for discrimination, is constitutionally sufficient.
*373 VALUATION
The value estimates of the experts and the analytical techniques used by them are as follows:
1981
Plaintiff Defendant
True value $2,965,100[1] $4,500,000
Approaches to value Income Income
Economic rent $ 573,366 $ 639,113
Vacancy & loss allowance 15% 3%
Expenses $ 93,939 $ 54,149
Effective net income $ 393,422 $ 564,891
Overall capitalization rate 14.28% 12.5%
1982
True value $3,356,200 [2] $4,750,000
Approaches to value Income Income
Economic rent $ 644,182 $ 672,750
Vacancy & loss allowance 15% 3%
Expenses $ 98,258 $ 59,478
Effective net income $ 449,297 $ 593,085
Overall capitalization rate 14.28% 12.5%
As the starting point for their respective determinations of economic rent both experts accepted the contract rents payable during the initial term of all leases except for the All Season Automotive lease, in which case the experts used the *374 rent payable under the first 5-year term as the starting point in their quest for economic rent. The experts being in agreement on the point indicated, proof of comparable leases is not required. See Evid.R. 3 (Anno.1983). The experts were not in agreement in the cases cited by defendant in support of its contention that the failure to offer comparable leases in evidence was fatal to plaintiff’s claim regarding economic rent. Those cases are thus not in point.
The point of dispute between the experts on the issue of economic rent is the quantum of the adjustment for the interval between the relevant assessing date and the inception date of the particular lease term. Plaintiff’s expert posits a discount of 10% per annum from the latter date to the former date; defendant’s expert assumes a 5%-discount rate for the same time periods. Plaintiff’s expert appears to rely upon the changes in the consumer price index (CPI) for the period 1978-1982, while defendant’s expert derives his 5%-discount rate from the increases in contract rents from one lease term to the next.
I conclude that the discount rate posited by defendant’s expert finds better support in the record. Under the facts in this case, the CPI does not reflect changes in real property values in defendant taxing district during the years under review. On the contrary, the changes in real property values in defendant municipality are more accurately reflected by the one-year unweighted, unclassified sales-ratio studies published by the Director, Division of Taxation. Those studies indicate a slight decline in value for the generality of properties from 1980 to 1982 and a much sharper decline in value for Class 4 properties (the class to which the subject property belongs) for the same time frame. Assuming — as I do — that rentals are directly related to value, the discount rate posited by defendant’s expert is, if anything, too liberal.
I therefore find the economic rent for the subject property to be $639,113 for tax-year 1981 and $672,750 for tax-year 1982, the amounts posited by defendant’s expert.
*375 Defendant must also prevail on the issue of vacancy- and collection-loss allowance. The 15%-vacancy estimate of plaintiffs expert is predicated upon his view that the flea market occupying the larger building (River View Market Place) is a marginal operation characterized by a high rate of turnover and resulting rental instability. The expert, however, made no analysis of the turnover rate in the flea market conducted on the subject property. His generalizations that flea markets are “fly-by-night” and that “they come and go” are not shown to be applicable to the flea market in the subject property. The 3%-vacancy and loss-rate proffered by defendant’s expert, while perhaps a little low, is nevertheless a more realistic estimate of the long-term quality and durability of the rental income stream from the entire property. (Plaintiff’s expert acknowledged that the other rental units on the subject property could always be rented.)
The difference in the experts’ expense estimates is confined to their respective reserve allowances for exterior structural replacements. Plaintiff’s expert posits a reserve of $58,963 for both years, while defendant projects a reserve of 3% of effective gross income ($19,173 for 1981 and $20,183 for 1982).
Plaintiff’s expert must prevail on this point. His estimate is based upon the cost a square foot to replace various structural components. Those costs were obtained from reliable, authoritative sources, namely, builders and shopping center developers. Defendant’s expert, on the other hand, could not demonstrate a relationship between the costs in question and the property’s effective gross income. Moreover, he ignored the cost of replacing the retaining wall along the river, nor did he consider the cost of replacing the escalators in the large building.
The final valuation issue to be resolved is the capitalization rate. Plaintiff’s expert offers the better reasoned analysis in this regard. He bases his estimate on the lack of what he called the “upside potential” of the subject property, comparing it unfavorably to more attractive, less risky investment vehi *376 cles. In his view, the subject property, consisting of a functionally obsolete, heterogeneous amalgam of randomly sited structures, converted from industrial to commercial retail uses, offered little opportunity for enhancement in value. His selection of a capitalization rate is supported by the voluminous statistical data appended to his appraisals. The defendant’s expert, on the other hand, relied upon sales of shopping centers to extract a capitalization rate from the marketplace. Those sales are not probative of the capitalization rate to be used in valuing the subject property, as the properties are not comparable to the subject. Evidence of comparable sales is effective in determining value of property for property tax purposes only where there is a substantial similarity between the properties so as to admit of a reasonable comparison. Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J.Tax 528 (App.Div.1981). Moreover, the expert was not conversant with many of the essential details of the sales upon which he relied. He examined no deeds or mortgages; he never examined the income and expense statements pertaining to any of those sales; and he was unfamiliar with the identity of the tenants in one of the shopping centers sold, although he admitted the importance of that information to a potential investor. The probative value of an expert’s opinion depends entirely upon the facts and reasoning adduced in support of it. Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax Ct.1980), aff’d o.b. per curiam, 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981); Evid.R. 56, comment 7 (Anno.1983).
In view of the foregoing I find the true value of the subject property to be $3,693,800 for 1981 (as adjusted for the exclusion of Lot 13) and $4,091,500 for 1982, calculated under the income method as follows:
1981
Gross income $ 639,113
Vacancy & loss allowance 19,173
Effective gross income $ 619,940
*377 1981
Less expenses:
Exterior maintenance & reserves $58,963
Management, legal & auditing fees and lease commissions 29,242
Miscellaneous 5,734
Total expenses 93,939
Effective net income $ 526,001
Capitalized at 14.28% (rounded) 3.683.500
Plus estimated cost new of Burger King structure 210,000
Total value of entire property 3.893.500
Less allocated value of Lot 13 (5.13%) (rounded) 199,700
True value $3,693,800
1982
Gross income $ 672,750
Vacancy & loss allowance 20,182
Effective gross income $ 652,568
Less expenses:
Exterior maintenance & reserves $58,693
Management, legal & auditing fees and lease commissions 32,853
Miscellaneous 6,442
Total expenses 98,258
Effective net income $ 554,270
Capitalized at 14.28% (rounded) 3,881,500
*378 1982
Plus estimated cost new of Burger King structure 210,000
True value $4,091,500
DISCRIMINATION
The New Jersey Constitution requires that all property within a taxing district be assessed in accordance with the same standard of value. N.J. Const. (1947), Art. VIII, § I, par. 1. Thus, it has long been axiomatic in this State that where a taxpayer’s property is assessed at a ratio to true value substantially higher than the common level of assessments or, if there is no such common level substantially higher than the director’s average ratio, such taxpayer is ordinarily entitled to a reduction of his assessment down to the common level or director’s ratio. In re Appeal of Kents, 2124 Atlantic Ave., Inc., 34 N.J. 21, 166 A.2d 763 (1961); Piscataway Assoc. v. Piscataway, 73 N.J. 546, 376 A.2d 527 (1977). To make out a case of actionable discrimination the taxpayer was required to prove (1) that real property in the taxing district was generally taxed at less than true value, (2) the common level of assessment or the absence thereof, and (3) the true value of the subject property upon which a common level or director’s ratio would operate. Continental Paper Co. v. Ridgefield Park, 122 N.J.Super. 446, 300 A.2d 850 (App.Div.1973). Prior to the enactment of chapter 123, A. 1973, (effective for 1974 and later years) a party labored to prove its ease by extensive statistical studies introduced through experts. See, e.g., Niktan Realty Co. v. Passaic, 1 N.J.Tax 393, 403-407 (Tax Ct.1980). Chapter 123, specifically N.J.S.A. 54:2-40.4 (now N.J.S.A. 54:51A-6), applicable to proceedings in this court, eliminates the burdensome statistical presentations and reduces the quest for relief to a relatively simple mathematical calculation. The statute provides, to the extent here pertinent, that a taxpayer is entitled to relief whenever (a) the ratio of assessment to the true value of its property is beyond the upper limit of the so-called “common level range” (15% above the director’s average ratio), or (b) *379 such ratio exceeds the county percentage level (100% in all cases). In either event, relief is provided by application of the director’s average ratio to the adjudicated true value of the property.
It is now clear that chapter 123 provides the exclusive remedy for assessment discrimination, Murnick v. Asbury Park, 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982), rev’g 2 N.J.Tax 168 (Tax Ct.1981), unless of course, the figures established under chapter 123 result in a deprivation of the constitutional remedy, Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983); or, to put it differently, that the legislative remedy is constitutionally insufficient.
The gravamen of plaintiff’s argument on the discrimination issue is the constitutional infirmity of chapter 123 as applied to its property for the years under review. Specifically, plaintiff contends that the statutory formula employed in the computation of the director’s ratio accords undue weight to large sales and that the weight given to such sales is tantamount to a class ratio the use of which has been proscribed as unconstitutional by our Supreme Court in Siegal v. Newark, 38 N.J. 57, 183 A.2d 21 (1962). Plaintiff also avers that the director’s ratio promulgated pursuant to chapter 123 is constitutionally inadequate as it is not representative of the common level of assessments prevailing in the defendant taxing district. The cure for all these infirmities, plaintiff continues, is to be found in the application of the one-year unweighted, unclassified ratio promulgated as at October 1 of each tax year on the basis of sales occurring in the 12 months ended June 30 of the tax year.
In evaluating plaintiff’s contentions a number of basic principles must be kept in mind. To begin with, courts have the inherent power to enforce constitutional rights, whether or not legislation purporting to implement those rights has been enacted. Peper v. Princeton University Board of Trustees, 77 N.J. 55, 389 A.2d 465 (1978); King v. South Jersey National Bank, 66 N.J. 161, 330 A.2d 1 (1974); Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (1973). The power to over *380 turn legislation on constitutional grounds, however, is not to be lightly exercised. To declare a statute unconstitutional the court must be satisfied that the enactment is clearly and indubitably repugnant to the constitution. Blair v. Erie Lackawanna Railway Co., 124 N.J.Super. 162, 305 A.2d 446 (Law Div.1973). More specifically, the legislative remedy for assessment discrimination enjoys a strong presumption of constitutionality. Jamouneau v. Harner, 16 N.J. 500, 109 A.2d 640 (1954); Rudd v. Cranford Tp., 4 N.J.Tax 236 (Tax Ct.1982); Murnick v. Asbury Park, 2 N.J.Tax 168 (Tax Ct.1981), rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982).
The restraints referred to above apply with even greater force to trial courts. Neeld v. Automotive Products Credit Ass’n, 21 N.J.Super. 159, 90 A.2d 558 (Cty.D.Ct.1952). A trial court should reach a constitutional issue only as a last resort and invalidate a statute only if it so clearly conflicts with the constitution as to leave no reasonable doubt of its defectiveness. Weisbrod v. Springfield Tp., 1 N.J.Tax 583 (Tax Ct. 1980); State v. Cannarozzi, 77 N.J.Super. 236, 186 A.2d 113 (App.Div.1962).
In the case before this court the chapter 123 ratio for the defendant municipality for 1981 is 47%. The upper limit of the common level range is 55%. The true value for 1981, as hereinabove found, is $3,693,800 (adjusted for the exclusion of lot 13). The 1981 assessments (exclusive of lot 13) total $1,967,-700. Thus, the ratio of assessments to true value is 53.27%, which lies within the upper limit of the common level range, and plaintiff is entitled to no discrimination relief unless this court concludes, within the restraints described above, that chapter 123 is repugnant to the New Jersey or United States Constitution. Plaintiff has not overcome the strong presumption of constitutional validity accompanying chapter 123.
Where, as in this case, the Legislature has drawn a line, viz., the upper limit of the common level range, the exact point at which that line is drawn inescapably involves a degree of arbitrariness. Yet that inevitable arbitrariness cannot pro *381 vide a basis for invalidating a statute as violative of the New Jersey and Federal Constitutions. Vance v. Bradley, 440 U.S. 93, 99 S.Ct 939, 59 L.Ed.2d 171 (1979); Estate of Kunkel v. United States, 689 F.2d 408 (3 Cir.1982), rev’g and remanding 518 F.Supp. 690 (M.D.Pa.1981); Mueller Estate v. Taxation Div. Director, 5 N.J.Tax 642 (Tax Ct.1983). As one court has noted, “[Ijegislative line drawing ... may produce different tax consequences in nearly identical situations, but such lines must be drawn to make a tax system workable and alterable.” Beals v. Commissioner of Corporations and Taxation, 370 Mass. 781, 352 N.E.2d 692 (Sup.Ct.1976). The assertion that denial of discrimination relief, because the assessment-to-value ratio lies within the line drawn by statute, is somehow a constitutional deprivation presupposes a precision that simply does not exist. The experts in this case constructed their respective value estimates upon interdependent hypotheses which, by their nature, cannot be proved with any degree of certainty. Time adjustments abound in their economic rent projections; vacancy and loss allowances are wholly subjective; the determination of the quantum of replacement reserves is based less upon hard data than upon prudential judgments and predictions; and the selection of the appropriate capitalization rate, notwithstanding the plethora of statistics invoked in aid thereof, comes down to an exercise in financial haruspication. Moreover, mathematical precision is not merely unattainable; it is not required. Baldwin Construction Co. v. Essex Cty Bd. of Tax., 16 N.J. 329, 108 A.2d 598 (1954); In re Appeal of Kents, supra; West Orange v. Goldman’s Estate, 2 N.J.Tax 582 (Tax Ct.1981).
Plaintiff also contends that, irrespective of the availability of relief under chapter 123, the director’s ratio promulgated thereunder is constitutionally defective in that it does not reflect the common level of assessments prevailing in the defendant municipality. Adequate relief, plaintiff continues, can only be obtained by applying the unweighted, unclassified ratio which,. it is alleged, reflects such common level.
*382 Assuming without deciding, that the unweighted, unclassified ratio reflects the common level for the 12-month period embraced by the sales study from which the ratio was derived, such ratio is simply not comparable to the chapter 123 ratio. The unweighted, unclassified ratio is based entirely upon sales occurring in only one year, whereas the chapter 123 ratio is derived from sales occurring over several years. As we said in Rudd v. Cranford Tp., supra:[3]
.. [T]he unweighted ratio is subject to temporary market fluctuations and ascribes inordinate influence to inadequate sales samples in a single year. The Legislature recognized this when it changed the chapter 123 ratio from a one-year, unweighted and unclassified ratio to the classified and weighted ratio, effective for 1979 and later years____ The new chapter 123 ratio reflects sales over a period of years, with a different weight assigned to each year on a multiple regression basis. The evident legislative design was to promote stability in assessments, and the statute implementing that objective enjoys a strong presumption of constitutionality. [4 N.J.Tax at 249; citations omitted]
The foregoing analysis applies with equal force to tax-year 1982. The result for that year, however, differs from 1981 in that plaintiff is entitled to statutory relief. The chapter 123 ratio for 1982 is 42%, while the upper limit of the common level range is 49%. The ratio of the assessments to the property’s true value is 50.7% ($2,074,300 h- $4,091,500), which is above the upper limit of the common level range, thereby entitling plaintiff to statutory relief. Plaintiff, however, claims this is constitutionally insufficient and that relief can only be provided by application of the 1982 tax year unweighted, unclassified ratio of 38.99%. Assuming, again without deciding, that the unweighted, unclassified ratio for the tax year is to be used if the unweighted ratio is to be used at all, a taxpayer must show by a fair preponderance of the evidence that the application of chapter 123 still leaves it with a confiscatory assessment. 525 Realty Holding Co. v. Hasbrouck Heights, 3 *383 N.J.Tax 206 (Tax Ct.1981). Plaintiff has made no such showing in this case.
Plaintiff also contends, as indicated above, that the weight ascribed to large sales is tantamount to the use of class ratios interdicted on constitutional grounds in Siegel v. Newark, supra. There, our Supreme Court held that discrimination relief was to be achieved by applying to the true value of taxpayer’s commercial property the general ratio applicable to all classes of property, rejecting taxpayer’s argument that the lowest of all the separate class ratios, i.e., the ratio ascribable to residential property, should be used. The Court concluded that application of the ratio applicable to a single class of property, as distinguished from the ratio applicable to the generality of properties, would violate the constitutional mandate that all property be assessed according to the same standard of value.
Plaintiff’s argument, while somewhat ingenious, is nevertheless flawed. To begin with, its major premise, viz., that all large sales are of class 4 properties, is false. One can well imagine the effect on a weighted ratio of a $1,000,000 sale of a palatial residence (a class 2 property) in Saddle River where no other sale of property, irrespective of class, exceeds $250,000. That large sale would have the same effect upon the ratio as the sale of a large industrial property. Moreover, under the director’s formula, the impact of large sales diminishes each year so that the class-ratio effect of large sales, to the extent that they all fall within the same class, is diluted by the passage of time.
Plaintiff also argues that two large sales were improperly included in the calculation of both the weighted and the unweighted ratios. The first sale of which plaintiff complains is a September 1978 sale of the Kearny Post Office for $26,176,639 (with an assessment-to-sales price ratio of $73.96%). The second sale complained of is a January 1982 sale of BASF-Wyandotte property for $3,680,000 (with an assessment-to-sales price ratio of $130.84%). The inclusion of these two sales in the ratio *384 calculation resulted in a ratio higher than that produced by their exclusion.
Plaintiff attacks the Post Office sale as unusable on the ground that it was a sale by the United States of America or other public authority proscribed from use in determining assessment-sales ratio for purposes of N.J.S.A. 54:1-35.1 by N.J.A.C. 18:12-1.1(a)(15). Plaintiff overlooks N.J.A.C. 18:12-1.1(b), which provides:
(b) Transfers of the foregoing nature should generally be excluded but may be used if after full investigation it clearly appears that the transaction was a sale between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell, and that it meets all other requisites of a usable sale.
The disputed Post Office sale is thus not ipso facto unusable; and plaintiff offered no evidence to show that the transaction was not a sale between a willing seller and a willing buyer or that it failed to meet all other requisites of a usable sale.
The BASF-Wyandotte sale figures not at all in the ratio calculation. The sale took place more than six months after the last relevant 12-month period for transactions includible in the calculation of a ratio, whether weighted or unweighted, for tax year 1982. Tax-year ratios are not to be used in the determination of discrimination relief. Rudd v. Cranford Tp., supra.
Plaintiffs final argument addresses the director’s alleged lack of statutory authority to “round up” chapter 123 ratios to the nearest whole integer, both in the calculation of the average ratio and in the determination of the common level range. This issue is moot in view of the dispositions herein made of all other contentions raised by plaintiff.
In view of the foregoing judgment will be entered affirming the 1981 assessments and determining the 1982 assessments to be as follows:
*385 1982
Lot 13 Lot 14 Lot 15
Land $ 80,420 $ 95,540 $242,380
Improvements 8,940 1,098,770 192,380
$1,194,310 $434,760 Total $ 89,360

lncludes $210,000 cost-based valuation of Burger King structure, in which estimate defendant’s expert concurs.

See note 1.

For an explanation of the methodology of the Director of the Division of Taxation in arriving at weighted and unweighted ratios and their use in local property tax assessment, see Gaynes v. Edison Tp., 179 N.J.Super. 373, 2 N.J.Tax 500, 432 A.2d 127 (App.Div.1980).